# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**SANDRA POWELL**
        **Plaintiff,**

    **v.**                              **Case No. 04C0829**

**UNITED INSURANCE COMPANY**
        **Defendant.**

---

## <u>DECISION AND ORDER</u>

Plaintiff Sandra Powell sues her former employer, defendant United Insurance Company, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., alleging that defendant maintained a sexually hostile work environment throughout her employment and that defendant retaliated against her by terminating her employment after she complained. Before me now is defendant's motion for summary judgment.[1] I have jurisdiction pursuant to 28 U.S.C. § 1331.

## I. FACTS & BACKGROUND

Plaintiff worked for defendant as a sales representative from 1998 until February 2004 when defendant discharged her. As a sales representative, plaintiff served policyholder clients in her district by answering their questions, reviewing their policies, assisting with their claims and collecting their premium payments on a monthly basis. When plaintiff collected her clients' monthly premiums, she visited them personally and then recorded the transactions in a hand-held computer device provided by defendant.

---

[1]Defendant also moves for leave to file an oversize reply brief, which motion I will grant.

Any premiums that a sales representative failed to collect from policyholders in a given month were known as "arrears."

As a sales representative, plaintiff spent a majority of her work time "out in the field" in direct contact with potential customers and policyholders within her assigned territory. However, defendant required sales representatives to appear at the office twice per week at designated times in order to turn in monies collected and to reconcile the status of the accounts of their customers. One of these office visits required plaintiff to be in the office for only 30-45 minutes. During the other office visit, defendant required the sales representatives to participate in a meeting led by a District Manager.

Defendant hired Sam Johnson in early 2001 as a District Manager. As a District Manager, Johnson supervised a staff of sales managers, including Carolyn Minley who in turn supervised sales representatives, including plaintiff. Plaintiff claims that beginning in July 2001, Johnson sexually harassed her. For example, she claims that in one instance he asked her if she "messed around" and that he put his hand on the inside of her knee between her legs while they were sitting in a parked car in front of a client's home. In another instance, Johnson rubbed his leg against plaintiff's leg while they were seated at a restaurant with a group of coworkers. In still another instance, Johnson attempted to rub plaintiff's shoulders and then poked her in the ribs. Plaintiff also claims that Johnson took her to his home where he "unbutton[ed] his clothes, [took] his shirt off and stuff." (Rashada Dep. ¶ 55.) Further, plaintiff alleges that over a period of two years, Johnson made several sexual comments to her. She states that in addition to asking her if she messed around, he called her "his girl." He also referred to two female sales representatives as "his soldiers." He further commented about the number of children plaintiff had and stated that

2

"we know what you like to do." In reference to one of his sexual encounters, he stated that he caught "something," presumably a sexually transmitted disease, from a young woman and laughed when other sales representatives referred to him as "dripping." He stated that plaintiff and her daughter had big butts. He told plaintiff that she looked like she "could suck a mean one" and that she needed to get with a real man like him. He also made references to plaintiff getting "banged." (Powell Dep. at 198.) He made noises like "mmm, mmm, mmm" when plaintiff walked in the office. (Id. at 188.) Plaintiff also states that she heard Johnson make sexual comments to other staff members such as Minley. For example, in response to a question about what Minley had in her mouth, Johnson answered, "the same thing [she] had in [her] mouth last night." (Id. at 193.) Plaintiff also states that she witnessed Johnson permit other female employees to engage in inappropriate conduct in the office such as sitting in a chair facing him with her legs spread while rubbing her thighs.

It appears that office administrator Cynthia Bonnell and Sales Manager Jameel Rashada[2] were aware of some of these incidents either through their own observations or because of plaintiff's complaints. For example, plaintiff complained to Bonnell and Rashada concerning Johnson touching her leg in the car. Rashada also saw Johnson put his hands on plaintiff's shoulders and heard Johnson comment on the fact that he "knew what [plaintiff] likes to do with all of those children." (Rashada Dep. at 72-73.) At some point, Rashada spoke to Regional Vice President William Patrick, Johnson's boss, about

---

[2]Jameel Rashada is male.

3

Johnson's behavior. Rashada claims that Johnson then began to "mess" with him by doing "little things to pick at me." (Id. at 84.)

On December 2, 2003, plaintiff claims that Johnson called her and asked if she was going to report him for making some sexual statements a few weeks previously. Plaintiff claims that she told Johnson that she would have to call him back and that, in response, Johnson accused her of stealing money from defendant. Johnson claims that he called plaintiff and asked her about her unacceptably high arrears, which were the worst among all the sales representatives in the Milwaukee office. In that phone call, Johnson claims that he told plaintiff that, in his experience, arrears in such high amounts reflected either one of two possibilities–that the agent was not working or that the agent was stealing the premium payments. In any case, plaintiff became upset and began crying. Plaintiff spoke to a coworker that evening and the coworker persuaded plaintiff that Johnson was preparing to fire her.

On December 3, plaintiff called defendant's Human Resources Department, spoke with Human Resources Manager Carla Johnson,[3] and complained about Johnson's behavior that plaintiff believed was sexual harassment, including that Johnson had said she "could suck a mean one," made comments about her rear end and more generally, that Johnson made comments having a sexual overtone and that he sometimes touched female employees while in the office.[4]

_____

[3]Sam Johnson and Carla Johnson are not related.

[4]Carla Johnson and her boss, Vice President of Human Resources Ken Oehler, investigated plaintiff's claims, but obtained no corroborating evidence. In letters dated January 6, 2004 and February 16, 2004, they informed plaintiff of the results of the investigation.

4

Later that day, Johnson called plaintiff into his office, presumably to finish the conversation from the previous night.[5] Bonnell also attended the meeting. During the meeting, Johnson asked plaintiff about the status of her arrears. Plaintiff became upset and began to cry because she believed that Johnson was accusing her of stealing. Because the meeting was not accomplishing anything, Johnson ended it by telling plaintiff that she could do whatever she felt she had to do–in terms of continuing her employment or resigning, and instructed her to leave her hand-held computer on her desk when she left the office. Plaintiff, however, claims that Johnson did not give her the option of voluntarily leaving her employment and informed her that he would have someone else complete her accounts because she was replaceable.

As plaintiff walked out of Johnson's office, she stated "I just got fired." Bonnell responded by telling plaintiff that Johnson had never said she was fired and that plaintiff "did not get fired." (Bonnell Dep. at 38.) When plaintiff returned home later that day, she called Carla Johnson to ask if she was fired. Carla Johnson checked into plaintiff's claim by calling Johnson and asking about the status of plaintiff's employment. Johnson told Carla Johnson that he did not fire plaintiff, but noted that he had spoken with her about her unacceptable arrears. Two days later, Carla Johnson spoke with plaintiff and told her that she was not fired and that she should report back to work. Plaintiff reported back to work and worked her regular schedule for the rest of December 2003 and January 2004.

In early February, 2004, defendant approved plaintiff's request for an extended vacation to begin on February 9, 2004. On February 5, 2004, plaintiff attended a meeting

––––––––––––––––––––

[5]There is no evidence in the record that Johnson knew about plaintiff's complaint to Human Resources when he called her into his office on December 3, 2003.

5

with Johnson and Minley. According to Johnson, the purpose of the meeting was to determine whether plaintiff was going to quit or return to work after her extended vacation as there were rumors floating around the office indicating that plaintiff did not intend to return.[6] During the meeting, Johnson questioned plaintiff regarding whether she was going to quit or return to work after her extended vacation. Plaintiff told Johnson and Minley that she had no intention of quitting and that she would speak with Johnson on February 10, 2004. Although Johnson continued to press the issue, plaintiff refused to answer Johnson's questions about whether she was quitting or not. She told Johnson that she just wanted to go on vacation. Johnson responded by saying "well, go on, take your vacation" and by telling plaintiff to leave behind the company's hand-held computer. (Minley Dep. at 91.) However, Johnson continued to demand an answer from plaintiff. Plaintiff did not answer. Instead, she asked Johnson if she was fired. To plaintiff's inquiry concerning whether Johnson had just terminated her, Johnson stated, "This is my office, that is my computer, leave it here and get out of my office." (Powell Dep. at 238.) Later, as plaintiff was gathering her belongings from her cubicle, Johnson told plaintiff to "get out of my office before I throw you out on your butt." (Id. at 239.) Plaintiff left the office.

Although plaintiff believed that Johnson terminated her employment, she wanted to let Johnson "cool off" for a couple hours before she spoke with him regarding her termination. She "wanted to clarify that [Johnson] was actually firing [her]." (Powell Dep. at 239.) She testified that she thought she may not have "under[stood] what he was saying," and that she decided she needed to "make for sure what his actions are." (Id. at

---

[6]For example, in December 2003, plaintiff informed Minley and other coworkers that she was thinking about resigning and in January 2004, she prepared a resignation letter.

240.) When she went back to clarify the situation, she discovered that defendant changed the security pass code on the office doors. In plaintiff's view, this confirmed that she was terminated. Despite plaintiff's belief that she was fired on February 5, 2004, plaintiff returned to the office once in each of the subsequent two weeks she was supposed to be on vacation to pick up her weekly paycheck.

Minley did not take any steps to reassign plaintiff's customers or district after the February 5 meeting because she assumed that plaintiff would return to work after her vacation. Moreover, even though defendant has a variety of required procedures to follow when a sales representative's employment terminates–either by resignation or through involuntary termination–defendant did not initiate any of the required procedures in relation to plaintiff until on or after February 25, 2004, at which time defendant sent plaintiff a letter terminating her employment for failing to return to work after her vacation.

Additional facts will be stated in the course of the decision.

## II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted only when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "Material" facts are those facts that might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute over such facts is "genuine" if the evidence is such that a reasonable trier of fact could find in favor of the nonmoving party. Id. The movant bears the burden of establishing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets its burden, the nonmoving party then must present specific facts showing that

7

there is a genuine issue of material fact.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion.  Anderson, 477 U.S. at 255.

### III.  DISCUSSION

**A.      Hostile Work Environment Claim**

Title VII forbids an employer from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  In the present case, plaintiff contends that defendant discriminated against her because of her sex by maintaining a hostile work environment.  In order to prevail on such a claim, plaintiff must establish that: (1) she was subjected to unwelcome sexual harassment; (2) the harassment was based on her sex; (3) the sexual harassment unreasonably interfered with her work performance by creating an intimidating, hostile or offensive work environment that affected seriously the psychological well-being of the plaintiff; and (4) there is a basis for employer liability. McPherson v. City of Waukegan, 379 F.3d 430, 437-38 (7th Cir. 2004).  For purposes of summary judgment, defendant concedes the first two elements.  However, defendant argues that it is entitled to summary judgment on plaintiff's hostile work environment claim because plaintiff cannot establish that defendant maintained a hostile work environment or that there is a basis for employer liability.

To prove that a hostile work environment existed, plaintiff must establish that she was subjected to conduct so severe or pervasive as to alter the conditions of her

8

employment and create an abusive working environment. Hilt-Dyson v. City of Chi., 282 F.3d 456, 462 (7th Cir. 2002) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998)). "[H]arassment need not be both severe and pervasive to impose liability; one or the other will do." Hostetler v. Quality Dining, Inc., 218 F.3d 798, 808 (7th Cir. 2000). Further, to qualify as hostile, the work environment must be "'both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" Hilt-Dyson, 282 F.3d at 463 (quoting Faragher, 524 U.S. at 787).

In the present case, the parties agree that plaintiff perceived the workplace to be hostile. Thus, I need only consider whether the work environment was objectively hostile. In determining whether a reasonable person would find the work environment hostile, I must consider all the circumstances cumulatively, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening and/or humiliating or merely offensive, and whether the harassment unreasonably interferes with an employee's work." Wyninger v. New Venture Gear, Inc., 361 F.3d 965, 975-76 (7th Cir. 2004); see also Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 444 (7th Cir. 1994) (stating that all incidents of harassment should be considered "cumulatively in order to obtain a realistic view of the work environment"). In evaluating whether statements and conduct are severe, physically threatening or intimidating, I must take into consideration the context in which the statements and conduct occurred. See Baskerville v. Culligan Int'l Co., 50 F.3d 428, 431 (7th Cir. 1995) (stating that "[r]emarks [that are] innocuous or merely mildly offensive when delivered in a public setting might acquire a sinister cast when delivered in the suggestive isolation of a hotel room"). Further, statements and actions that

9

are not directed at the plaintiff are objectively less offensive than conduct and statements that are directed at the plaintiff. Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1144 (7th Cir. 1997) (stating that "the impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff").

Title VII "does not mandate admirable behavior from employers," and thus "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" will not amount to a hostile work environment. Haugerud v. Amery Sch. Dist., 259 F.3d 678, 693 (7th Cir. 2001); see also Baskerville, 50 F.3d at 431 (noting that "[a] handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage"). In fact, "many employees have to put up with some amount of rude, arrogant, or boorish behavior at work." Patton v. Indianapolis Pub. Sch. Bd., 276 F.3d 334, 339 (7th Cir. 2002). As the Seventh Circuit has stated:

> Drawing the line [between vulgar behavior and sexually harassing behavior] is not always easy. On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied, uninvited sexual solicitations, intimidating words or acts, obscene language or gestures, pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, or coarse or boorish workers.

Baskerville, 50 F.3d at 430-31. Using this standard, courts have concluded that statements that "could [easily] be repeated on primetime television" do not trigger Title VII liability. Id.

Moreover, conduct involving physical contact as opposed to verbal behavior increases the severity of the harassment. Worth v. Tyer, 276 F.3d 249, 268 (7th Cir. 2001). However, some forms of contact "although . . . uncomfortable for the person touched, are relatively minor" such as "[a] hand on the shoulder, a brief hug, or a peck on the cheek." Hostetler, 218 F.3d at 808. Further, "[e]ven more intimate or more crude

10

physical acts--a hand on the thigh, a kiss on the lips, a pinch of the buttocks--may be considered insufficiently abusive to be described as 'severe' when they occur in isolation." Id.

Although plaintiff claims that she was offended by several of Johnson's comments, not all of the comments implicate Title VII. For example, plaintiff alleges that Johnson referred to two female sales representatives as "his soldiers" and referred to plaintiff as "his girl" and made noises like "mmm, mmm, mmm" when plaintiff walked in the office. However, these statements are not objectively threatening, harsh or abusive and arguably cannot even be characterized as vulgar and thus they are not the type that could trigger Title VII liability. See Baskerville, 50 F.3d at 431 (comments that "could [easily] be repeated on primetime television" are not the type that trigger Title VII liability).

With respect to Johnson's other comments, including that he knew "what [plaintiff] like[d] to do," that plaintiff and her daughter had big butts, that plaintiff "could suck a mean one," that plaintiff needed a real man, that plaintiff needed to get "banged" and that he caught "something" from a young woman, these are more clearly vulgar banter. However, these statements are not severe because they are not physically threatening or intimidating as the majority of them were made in public places such as the center of defendant's office. See Baskerville, 50 F.3d at 430 (noting that statements that are "mildly offensive when delivered in a public setting might acquire a sinister cast when delivered in the suggestive isolation of a hotel room"). Indeed, these statements appear to be only "occasional vulgar banter, tinged with sexual innuendo," Baskerville, 50 F.3d at 430-31, and are no worse than statements that the Seventh Circuit has concluded were insufficient to establish a hostile work environment in other cases, cf. McPherson, 379 F.3d at 439

11

(finding all conduct prior to sexual assault insufficient to establish a hostile work environment despite comments about plaintiff's bra, comments about plaintiff in lingerie shown in a magazine, proposition to plaintiff that supervisor would make a 'house call' when she was sick and the supervisor pulling back the tank top worn by plaintiff); Patt v. Family Health Sys., Inc., 280 F.3d 749, 754 (7th Cir. 2002) (holding that eight sex-related comments, including that "the only valuable thing to a woman is that she has breasts and a vagina" were insufficient to establish a hostile work environment); Pryor v. Seyfarth, Shaw, Fairweather & Geraldson, 212 F.3d 976, 977 (7th Cir. 2000) (holding that several comments suggesting male boss would like to see his female secretary in sexually provocative outfits were insufficient to create objectively hostile work environment). Furthermore, these statements were not pervasive. They occurred over the course of two years of employment during which plaintiff was not required to be in the office everyday and thus had no contact with Johnson. See Baskerville, 50 F.3d at 431 (explaining that "[a] handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage").

Moreover, Johnson's physical contact with plaintiff also was not severe or pervasive. Plaintiff alleges that Johnson touched her on three occasions in two years. First she claims that he put his hand on the inside of her knee after asking if she wanted to "mess around." Second, she claims that he rubbed his leg against hers during lunch at a restaurant with coworkers. Finally, she claims that he rubbed her shoulders and poked her in the ribs when she objected to the shoulder rub.[7] Although, as stated above, touching

---

[7]To support her harassment claim, plaintiff also notes that Johnson took plaintiff to his home during working hours and undressed. However, I cannot consider this evidence

increases the severity of the harassment, <u>Worth</u>, 276 F.3d at 268, in the present case, the physical contact was minor as it did not involve intimate body parts.  <u>See</u>  <u>Hostetler</u>, 218 F.3d at 808 (noting that "a hand on the shoulder, a brief hug or a peck on the cheek" are relatively minor incidents of touching); <u>DiCenso v. Cisneros</u>, 96 F.3d 1004, 1009 (7th Cir. 1996) (concluding that plaintiff did not establish a hostile environment when physical contact did not involve an intimate body part).  Moreover, there is no indication in the record that the touching was threatening, intimidating or humiliating as the events occurred in a public setting, the office and in front of a client's home.  <u>Hilt-Dyson</u>, 282 F.3d at 463 (explaining that "an employee's claim must be evaluated in light of the social context in which events occurred").  Finally, Johnson only touched plaintiff three times over a course of two years and thus these events were not pervasive.  <u>Hostetler</u>, 218 F.3d at 808 (concluding that if minor touching incidents are "few and far between" they typically will not support a hostile environment claim).

Further, although plaintiff alleges that she witnessed Johnson permit other female employees to engage in inappropriate sexually tinged conduct in the office and overheard Johnson make an inappropriate comment to Minley, these events are not severe because they were not directed at plaintiff.  <u>Gleason</u>, 118 F.3d at 1144 (stating that "the impact of

_____

in determining whether to grant summary judgment as the only evidence of this event in the record is hearsay.  <u>See</u> <u>Morrow v. WalMart Stores, Inc.</u>, 152 F.3d 559, 563 (7th Cir. 1998) (stating that "hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial").  The only evidence in the record about this event is in the deposition of Rashada, who testified that plaintiff told him she was in Johnson's car "[a]nd he stopped by his house . . .   Then she said he went into another room which was his bedroom and . . . she said he asked her to come here.  And then she said when she go to the room he started unbuttoning his clothes, taking his shirt and stuff off." (Rashada Dep. at 55.)  Rashada's testimony is offered for the truth of the matter asserted and thus is hearsay.

13

'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff"). Moreover, nothing in the record indicates that this conduct was pervasive.

Finally, when considering these events cumulatively,[8] I cannot conclude that plaintiff establishes that her work environment was objectively hostile. None of the statements or physical contact were severe. Rather, the statements amount to vulgar banter, tinged with sexual innuendo and the physical contact was minor. Neither the statements nor the physical contact was physically threatening or intimidating. Further, the comments and the physical contact were not so pervasive as to create a hostile environment as the record indicates that these events occurred sporadically over the course of two years. Accordingly, defendant is entitled to summary judgment on this claim.[9]

**B.    Retaliation Claim**

Under Title VII, unlawful retaliation occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination. 42 U.S.C. § 2000e-3(a). To prevail on a claim of unlawful retaliation, plaintiff must establish that: (1) she engaged in statutorily-protected expression; (2) she suffered an adverse employment action; and (3) there was a causal link between the protected expression and the adverse action. Culver v. Gorman & Co., 416 F.3d 540, 545 (7th Cir. 2005).

_____

[8]Defendant argues that the equitable doctrine of laches bars plaintiff from relying on conduct occurring outside the relevant period of limitations, 300 days, to support her hostile work environment claim. However, I need not consider this argument because even considering all the evidence set forth by plaintiff to support her claim, she cannot establish that her work environment was objectively hostile.

[9]Because plaintiff cannot establish that her work environment was hostile, I do not need to consider whether there is a basis for employer liability.

14

In the present case, the parties do not dispute that plaintiff engaged in statutorily-protected expression. Additionally, it is undisputed that defendant terminated plaintiff's employment and thus she suffered an adverse employment action. See Rhodes v. Ill. Dep't of Transp., 359 F.3d 498, 504 (7th Cir. 2004) (stating that an adverse employment action is a "significant change in the claimant's employment status such as . . . discharge"). The real issue in this case is whether plaintiff can establish a causal link between her complaints and the termination. She contends that if defendant terminated her on February 5, 2004, she has presented sufficient evidence to establish a causal link between her complaint and the termination. She does not dispute that if defendant terminated her on February 25, 2004 she would be unable to establish a causal link. Thus, before turning to the causation question, I must determine whether plaintiff was terminated on February 5, 2004 or February 25, 2004.

Two factors are necessary to establish the date on which the termination occurred. First, there must be a final, ultimate, non-tentative decision to terminate the employee. Flannery v. Recording Indus. Ass'n of Am., 354 F.3d 632, 637 (7th Cir. 2004). Second, the employer must give the employee "unequivocal" notice of its final termination decision. Id. (citing Dvorak v. Mostardi Platt Assocs., Inc., 289 F.3d 479, 486 (7th Cir. 2002)). Both elements are necessary to establish the date on which the termination occurred. Id.[10] Notice is not unequivocal if the employee is unsure of his employment status after

---

[10]Although this test is most often used in the context of statute of limitations issues in discrimination cases, see, e.g., Flannery, 354 F.3d at 652, the Seventh Circuit has also used it to determine the date of a termination in other contexts, see Dvorak, 289 F.3d at 486 (using this test to establish when a termination occurred in order to determine what information the employer had about the employee's performance as of the date of the termination). Accordingly, it is the appropriate test to use in the present case.

receiving the notice. See Dvorak, 289 F.3d at 486 (stating that plaintiff's request for clarification as to his employment status tends to show that any notice he might have received of his termination was not all that unequivocal).

With respect to the first element, no reasonable jury could conclude that defendant made a "non-tentative decision" to terminate plaintiff as of February 5, 2004. First, it is undisputed that defendant continued to pay plaintiff weekly for two weeks after February 5, 2004, the period during which she was supposed to be on vacation. This is so even though vacation time for sales representatives at United is not "accrued" and therefore is not paid out in cash when an agent terminates employment. (Oehler Decl. ¶ 27.) Plaintiff presents no evidence to the contrary. Second, neither plaintiff's supervisor, Minley, nor anyone else at United, reassigned plaintiff's accounts to any other sales representative during the two weeks that plaintiff was on vacation. Third, even though defendant has a variety of required procedures to follow when a sales representative's employment terminates, defendant did not initiate any of the required procedures in relation to plaintiff until on or after February 25, 2004. (Oehler Decl. ¶ 28.) Again, plaintiff present no evidence to the contrary.

Moreover, with respect to the second element, no reasonable jury could conclude that defendant gave plaintiff "unequivocal" notice of her termination on February 5, 2004. First, although Johnson told plaintiff to leave her hand-held computer in his office and sales representatives must leave computers in the office if they are fired, sales representatives are also required to leave their computer at the office when they leave on vacation. (Minley Dep. at 21.) Johnson also instructed plaintiff to leave her hand-held computer on the desk when she left the office on December 3, 2003, and plaintiff was not terminated after the

16

December 3, 2003 meeting. Further, although Johnson told plaintiff to "Get out of my office before I throw you out on your butt," he never stated that plaintiff was fired. Moreover, even though plaintiff believed that she was terminated at the February 5, 2004 meeting, she was unsure. She testified that she returned to the office a couple of hours later to talk to Johnson after he had "cool[ed] off." She "wanted to clarify that [Johnson] was actually firing [her]." (Powell Dep. at 239.) She testified that she thought to herself, "Maybe I didn't understand what he was saying" and that she needed to "make for sure what his actions are." (Id. at 240.) See Dvorak, 289 F.3d at 486 (stating that plaintiff's request for clarification as to his employment status tends to show that any notice he might have received of his termination was not all that unequivocal). Thus, under these circumstances, no reasonable jury could conclude that the office meeting provided unequivocal notice of termination.

Plaintiff, however, argues that she was notified of her termination by the fact that, when she returned to United later on February 5, 2004, the security codes were changed and she could not get in. Although the record contains testimony that security codes are changed when an employee is terminated, the mere fact that the codes were changed is not "unequivocal" notice of termination. Indeed, defendant could have had other reasons for changing the security codes. Furthermore, plaintiff did not treat the change of security codes as an unequivocal notice of termination. As noted previously, she returned to the office during each of the next two weeks to pick up her paycheck. Thus, no reasonable jury could conclude that defendant gave plaintiff unequivocal notice of her termination on February 5, 2004.

17

Accordingly, I conclude that defendant did not terminate plaintiff until February 25, 2004. Because plaintiff presents no evidence indicating that there is a causal connection between her complaint and her termination on February 25, 2004, I will grant summary judgment to defendant on the retaliation claim. However, even if I were to conclude that plaintiff was terminated on February 5, 2004, I would still conclude that defendant is entitled to summary judgment on the retaliation claim because plaintiff fails to establish a causal connection between her complaint[11] and the termination.

"A causal link between the protected expression and an adverse employment action may be established by showing that the protected conduct was a substantial or motivating factor in the employer's decision." Culver, 416 F.3d at 545. "A motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions." Id. There are two types of permissible evidence that may be used to establish a causal connection between the protected activity and the adverse employment action. First, there is direct evidence, i.e., evidence that, if believed by the trier of fact, would prove the fact in question "without reliance on inference or presumption." Walker v. Glickman, 241 F.3d 884, 888(7th Cir. 2001). Direct evidence "essentially requires an admission by the decisionmaker that his actions were based upon the prohibited animus." Radue v. Kimberly-Clark Corp., 219 F.3d 612, 616 (7th Cir. 2000).

---

[11]Only the December 3, 2003 complaint made to Human Resources is relevant in determining whether a causal connection exists. Although plaintiff subsequently filed an EEOC charge on January 14, 2004, she presents no evidence that Johnson knew about the EEOC charge when he allegedly terminated her on February 5, 2004 and thus she cannot establish a causal connection between the EEOC charge and the termination. See Holmes v. Potter, 384 F.3d 356, 362 (7th Cir. 2004) ("Usually, an employer's lack of knowledge about a protected [activity] rings a death knell for discrimination claims.").

18

Plaintiff presents no direct evidence that Johnson terminated her in retaliation for filing a complaint with Human Resources and thus plaintiff must rely on circumstantial evidence, i.e., evidence that allows a jury to infer intentional discrimination by the decisionmaker. Gorence v. Eagle Food Ctrs., Inc., 242 F.3d 759, 762 (7th Cir. 2001). Circumstantial evidence includes "suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group." Rudin v. Lincoln Land Cmty. College, 420 F.3d 712, 720 (7th Cir. 2005). Circumstantial evidence must point directly to a discriminatory reason for the employer's action. Adams v. Wal-Mart Stores, Inc., 324 F.3d 935, 939 (7th Cir. 2003).

With respect to circumstantial evidence, "[m]ere temporal proximity between the filing of the charge of discrimination and the action alleged to have been in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue." Stone v. City of Indianapolis Pub. Utils. Div., 281 F.3d 640, 644 (7th Cir. 2002); see also Lang v. Ill. Dep't of Children & Family Servs., 361 F.3d 416, 419 (7th Cir. 2004) (same). "[S]tray workplace remarks" may "qualify as . . . evidence of discrimination" only if plaintiff can "show that the remarks were related to the employment decision in question." Cianci v. Pettibone Corp., Beardsley Piper Div., 152 F.3d 723, 727 (7th Cir. 1998).

Plaintiff contends that she has established a causal connection because of the close temporal proximity of her December 2003 complaint and the termination in February 2004. However, this two month delay between the protected activity and the allegedly retaliatory conduct is too attenuated to create a suspicion of a causal connection. See, e.g., Contreras v. Suncast Corp., 237 F.3d 756, 765 (7th Cir. 2001) (declining to find a causal connection based solely on a 26 day temporal relation between protected conduct and

19

allegedly retaliatory action); Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 511 (7th Cir. 1998) (noting that as the time between the protected activity and adverse action increases, the suspicion of causation weakens).

Plaintiff also claims that Johnson's statements evidence a causal connection between the complaint and the termination. For example, she points out that a few days after her December complaint Johnson stated that "[t]he next person that complains, he's going to write them up, and he's going to personally take care of" them (Pl.'s Dep. at 207), and notes that on several occasions Johnson stated that plaintiff was replaceable. Further, plaintiff presents evidence that Johnson "messed" with another employee, who had previously complained about Johnson, by doing "little things to pick at [him]." (Rashada Dep. at 84.)

However, the fact that Johnson indicated plaintiff could be replaced does not supply a reasonable inference that she was fired in retaliation for her complaint. In fact, the record indicates that Johnson made similar statements before he knew that plaintiff complained. Moreover, plaintiff presents no other evidence indicating that these comments were made contemporaneously with or were otherwise related to her termination. See, e.g., Cullen v. Olin Corp., 195 F.3d 317, 323 (7th Cir. 1999) (holding that stray workplace comments unrelated to the alleged discriminatory employment decision are not sufficient to support an inference of discrimination). Vague comments about plaintiff being "replaceable" do not indicate that Johnson terminated plaintiff because she complained. Further, Johnson's statement indicating that he would write up the next person that complains also does not indicate that defendant's motive for firing plaintiff nearly two months later was retaliatory as there is no evidence that this statement related to the termination. This two month

20

delay is too attenuated to create a suspicion of a causal connection. See, e.g., Markel v. Bd. of Regents of Univ. of Wis. Sys., 276 F.3d 906, 910 (7th Cir. 2002) (holding that statements made two months before termination were not contemporaneous and therefore did not constitute circumstantial evidence). Finally, the fact that Johnson "messed" with another employee after that employee complained does not evidence his intent to terminate plaintiff for complaining about his sexual misconduct. The undisputed evidence indicates that Johnson did not terminate the other employee for complaining and thus no reasonable jury could infer an intent to terminate plaintiff for engaging in similar conduct. Accordingly, plaintiff's evidence does not point directly to a discriminatory reason for Johnson's actions. See Adams, 324 F.3d at 939 (noting that circumstantial evidence "must point directly to a discriminatory reason for the employer's action") (emphasis added). Thus, defendant is also entitled to summary judgment on the retaliation claim because plaintiff cannot establish a causal connection between the February 5, 2004 termination and her complaint to the Human Resources Department.

## IV. CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that defendant's motion for leave to file an oversize reply brief is **GRANTED.**

21

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment is **GRANTED** and this case is **DISMISSED**.

Dated at Milwaukee, Wisconsin this ___ day of June, 2006.

_____
LYNN ADELMAN
District Judge